# Frank T. Kinnare, Adm., v. Leon Klein.

1. PRACTICE—*Withdrawing Evidence from the Jury.*—Where there is any one essential allegation of a declaration which has no evidence to support it, it is the duty of the court to exclude from the consideration of the jury all the evidence in the case, or to charge the jury that there is no evidence to support the essential allegation, and for want of such proof to find for the defendant.

2. SAME—*Motions to Exclude Evidence and to Instruct the Jury to Find for the Defendant Are in Nature of Demurrers to Evidence.*— Where there is any one essential allegation of a declaration which has no evidence to support it, motions to exclude the evidence and motions to instruct the jury to find for the defendant, are in the nature of demurrers to the evidence, and admit not only all that the testimony proves, but all that it tends to prove.

3. SAME—*Where Court May Direct a Verdict Against Party Holding Affirmative.*—If there is no evidence before the jury, on a material issue, in favor of the party holding the affirmative of that issue, on which the jury could, in the eye of the law, reasonably find in his favor, the court may exclude the evidence or direct the jury to find against the party so holding the affirmative; but when there is such evidence before the jury, it must be left to them to determine its weight and effect.

4. WORDS AND PHRASES—"*Evidence Tending to Prove.*"—"Evidence tending to prove" means more than a mere scintilla of evidence, but evidence upon which the jury can, without acting unreasonably in the eye of the law, decide in favor of the plaintiff, or the party producing it.

5. NEGLIGENCE—*Constituting a Good Cause of Action.*—Actionable negligence, or negligence which constitutes a good cause of action, grows out of a want of ordinary care and skill in respect to a person to whom the defendant is under an obligation or duty to use ordinary care and skill.

Action in Case, for personal injuries.—Appeal from the Circuit Court of Cook County; the Hon. ELBRIDGE HANECY, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1899. Affirmed. Opinion filed April 17, 1900.

**Statement of Facts.**—The deceased, Abraham Strauss, was a lad about seventeen years old on the day of his death, June 26, 1896. He had been working for different employers for about five years and had been employed by Leon Klein, the defendant, for from five to seven weeks at the

time he met his death. He was hired as an inspector and bundle wrapper, the duties of which employment kept him in a balcony on the main floor of defendant's department store. He was a bright, intelligent lad, careful, obedient, temperate, and of quiet disposition. His faculties were normal and perfect. When he was hired by the defendant he was instructed in his duties as wrapper and inspector and worked steadily in that capacity until Friday morning of each week. On that day it was the custom in defendant's store to bring up barrels of glassware from the basement to the main floor. This work was superintended by the chief inspector, Joseph Neides, who ordered deceased to assist each Friday morning of his employment. It was the custom for Neides and deceased to go into the basement on that day, roll five or six barrels of glassware from the storeroom to a freight elevator, put them on the elevator and carry them in that way to the main floor. This freight elevator ran in a shaft extending from the basement to the roof of the four-story building, was in the usual platform and brace form, operated by steam and started or stopped by pulling a cable. The shaft was built of brick, lighted by windows, and was provided with doors at each floor, made of corrugated iron, sliding together from above and below and provided with a catch holding the sliding parts together from the inside when they met. There was no knob or key on the outside of the doors. It appears from the evidence that there was no exclusively employed elevator operator, but that one Brummell was hired to run it, besides being receiving clerk, carpenter and general porter, and that it was Brummell's duty, under the terms of his employment, to run the elevator if anybody requested it, and that he did run it from fifty to one hundred times a day. Some of the employes of defendant, including young cash boys, seem to have operated the elevator when they needed it. The testimony of several witnesses showed that employes on upper floors sometimes opened the elevator doors from the outside by inserting thin cardboards or instruments in the space between the doors, pressing against

the catch, and having released it, pulled the cable of the elevator to bring the cage up or down. There was no bell or signal in the shaft to warn parties near the elevator that it was about to move. It appears that the heads of departments or managers of employes knew of this practice, and themselves also sometimes operated the elevator in the same way. The doors to the shaft in the basement swung back on hinges and were open all day, giving free access to the shaft. On the morning of the day of the accident, Neides, the chief inspector for defendant, ordered deceased to go to the basement with him to bring up glassware. Deceased had done this on several Fridays previous, and seems to have known what was expected of him. Together they went to the basement to a shed under the sidewalk where the glassware was kept, about 225 feet from the elevator. Five or six barrels were rolled by them to a point ten or twelve feet from the freight elevator, preparatory to placing them on the platform to take to the main floor. While deceased was tipping the last barrel on end, a cash boy called the chief inspector away on business of immediate importance. Before leaving, Neides told deceased to wait for him, that he would be back in a few minutes, and was absent four or five minutes in all. On previous occasions deceased had operated the elevator while Neides was with him, but had never been warned or instructed concerning the elevator and did not operate it like an elevator man of experience would, and had never operated it alone. Under the supervision of Neides, he had operated it about a half dozen times. The last act deceased was seen doing was to stand the last of the barrels on end. When Neides returned, four or five minutes later, deceased had been lifted out of the bottom of the shaft where he was found, crushed so severely that death ensued quickly. It appears that a noise was heard proceeding from the elevator shaft, and the car was observed running up and down with two barrels upon it. The elevator doors at the third floor were found to have been forced outward several inches, and blood and clotted hair were found on the walls of the shaft between

the second and third floors.  No witness saw the mishap, but Brummel found deceased lying completely in the shaft at the bottom with his head crushed.

This suit was brought by the administrator of deceased to recover damages from the proprietor of the store for alleged negligence ·in controlling and operating the elevator.  A jury was impaneled, and at the close of plaintiff's case, the court gave an instruction to find the defendant not guilty.

Judgment for defendant and for costs against plaintiff was duly ordered, from which this appeal is prosecuted.

WHEELER & SILBER, attorneys for appellant.

JOHN A. POST and W. N. WILLIAMS, attorneys for appellee.

MR. JUSTICE SHEPARD delivered the opinion of the court.

In Frazer v. Howe, 106 Ill. 563, the court, speaking through Mr. Justice Scholfield, with reference to the practice and effect of an instruction to find for the defendant, said :

" The practice of withdrawing the evidence from the jury, although looked upon with disfavor (citing prior decisions), is nevertheless admissible, and where there is any one essential allegation of a declaration which has no evidence to support it, we have held it is the duty of the court to exclude from the consideration of the jury all the evidence in the case, or to charge the jury that there is no evidence to support the essential allegation, and for want of such proof to find for the defendant.  (Citing 84 Ill. 269.)  Motions to exclude evidence, and motions to instruct the jury to find for the defendant in such cases, are in the nature of demurrers to evidence, and hence they admit not only all that the testimony proves, but all that it tends to prove.  (Citing 101 Ill. 93.)

If there is no evidence before the jury, on a material issue, in favor of the party holding affirmative of that issue, on which the jury could, in the eye of the law, reasonably find in his favor, the court may exclude the evidence, or direct the jury to find against the party so holding the affirmative; but when there is such evidence before the

jury, it must be left to them to determine its weight and effect. (Citing Best on Evidence.)

It is not within the province of the judge, on such a motion, to weigh the evidence and ascertain where the preponderance is. This function is limited strictly to determining whether there is, or is not, evidence legally tending to prove the fact affirmed, *i. e.*, evidence from which, if credited, it may reasonably be inferred, in legal contemplation, the fact affirmed exists, laying entirely out of view the effect of all modifying or countervailing evidence. (Citing prior decisions.)"

No subsequent case has departed from the rule so laid down, although there have been some explanations of certain expressions in it. Thus, in Simmons v. Chicago and Tomah R. R. Co., 110 Ill. 340, the court, in discarding the doctrine that a scintilla of evidence tending to support the plaintiff's case would require the case to be submitted to the jury, applies this test to that phase of the law, viz.:

"When the evidence given at the trial, with all inferences that the jury could justifiably draw from it, is so insufficient to support a verdict for the plaintiff, that such a verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but may direct a verdict for the defendant. (Citing many authorities.)"

Again, in Bartelott v. International 'Bank, 119 Ill. 259, Frazer v. Howe, *supra*, and Simmons v. Railroad Co., *supra*, are approved, and it is said:

"It is apparent that 'evidence tending to prove' means more than a mere scintilla of evidence, but evidence upon which the jury could, without acting unreasonably in the eye of the law, decide in favor of the plaintiff, or the party producing it."

The limitation upon the judge not to invade the function of the jury upon questions of fact, is, however, there again protected by a reiteration that in passing upon the question the judge is not authorized to weigh the evidence and decide where the preponderance is.

If anything was left of the "scintilla rule of evidence" before Offutt v. Columbian Exposition, 175 Ill. 472, that case disposed of it; but even with that done, Chief Justice Carter in speaking for the court, recognized and discussed

the confusion that existed because of the different meanings attached to the phrase "tending to prove," and besides quoting with approval the foregoing paragraph from the Bartelott case, *supra*, as solving most of the difficulty, quoted, also, from Mr. Justice Munle, as follows:

"Applying the maxim *de minimis non curat lex*, when we say that there is no evidence to go to the jury, we do not mean that there is literally none, but that there is none which ought reasonably to satisfy the jury that the fact sought to be proved is established."

And again, he quotes from Connor v. Giles, 76 Me. 132, that "there is no practical or logical difference between no evidence and evidence without legal weight."

Then Judge Carter adds, that which requires no affectation on our part to record the excellence of:

"It is of course true that there are cases where there is literally no evidence in support of some material and necessary allegation, but there are many others where there may be some evidence tending in some remote degree to support every allegation, yet of too inconclusive and unsubstantial a character to be the foundation of a verdict. In either of such cases the court may, when the question is properly raised, so determine, and direct a verdict as in cases where there is no evidence."

The limitation upon the judge, not to weigh the evidence nor to pass upon the credibility of the witnesses, questions reserved solely for the jury, is again invoked in the Offutt case; and as to the duty of the judge in passing upon a motion to take the case from the jury, in either of the modes we have been speaking of, it is there said:

"The province of the jury must not be invaded, and where reasonable minds, acting within the limitations prescribed by the rules of law, might reach different conclusions, the evidence must be submitted to the jury."

With these rules to guide our inquiry, the question before us is, as said by Mr. Justice Craig in the late case of Illinois Central R. R. Co. v. Harris, 184 Ill. 57 (see, also, I. C. R. R. Co. v. Griffin, 184 Ill. 9), "whether the evidence, with all inferences to be properly drawn therefrom, fairly tended to prove plaintiff's cause of action as set out in his declaration."

We have set forth in the statement of facts that precedes this opinion all the material facts the record contains.

Appellant does not state anywhere which one or more of the three original counts of the declaration or of the five additional counts thereof, he relies upon, and we will have to follow the order of his argument to find out wherein it is he claims that appellee was guilty of actionable negligence. No brief with points, as required by the rules of this court, accompanies the labeled "argument on behalf of appellant" (that is not in any manner subdivided or separated), and it is not easy to find just what it is that appellant places reliance upon. Though we overlook the departure from our rules, we will not be disposed to examine each count of the declaration with reference to the details of evidence that may possibly tend to support it, any further than is indicated by the argument. It will be all that our broadest sense of duty and justice demands, if we diligently endeavor to cull from the mass of appellant's argument, what his contentions are.

We first observe the general statement that " the plaintiff charged the defendant with keeping the elevator in a negligent condition, with failing to instruct or warn deceased, and with disregarding ordinances of the city of Chicago regulating the use and control of freight elevators; " and then follows a reference to sections 1571, 1572, 1614 and 1653, of the ordinances of the city of Chicago, relating to and regulating the use of elevators.

Later on, said sections 1653 and 1572 only, are specifically mentioned and argued upon as having been violated by appellee.

We will first consider section 1653 with reference to the evidence. It is as follows :

" Section 1653. It shall be the duty of every person owning, controlling, operating or using as owner, lessee or agent, any passenger or freight elevator, in any building within the corporate limits, to employ some competent person to take charge of and operate the same, and any such person who shall neglect to comply with the provisions of this section shall be fined the sum of $10 for each and every day of such neglect."

Kinnare v. Klein.

The rule we have hereinbefore referred to, that a motion made at the close of the plaintiff's evidence to instruct the jury to find for the defendant, admits the truth of all that the evidence in behalf of the plaintiff, together with all inferences to be properly drawn therefrom, does not go so far as to include a part only of the evidence of a witness who has testified to a fact upon his examination in chief, which he withdraws from upon cross-examination. In considering what his testimony proves or tends to prove, all of his testimony must be considered together.

It is claimed in argument that because one witness testified upon his examination in chief that he knew of his own knowledge that Brummell was not hired to run the elevator, but was receiving clerk, carpenter and general porter, it was admitted, by the motion to instruct the jury to find for the defendant, that the ordinance was violated. This same witness upon cross-examination was compelled to admit that what, in such respect, he had testified upon examination in chief as being within his own knowledge, was a mere guess by him, and that he did not know anything about it.

Besides, Brummell, who was called as a witness by appellant, testified that he was employed to run the elevator, besides doing other work; that he had run the elevator ever since it was in the building, fifty, sixty, and sometimes a hundred times a day, and would do it whenever asked. The ordinance does not seem to require, nor would it be reasonable to inject into it a meaning that some one should be employed whose exclusive duty would be to take charge of and operate the elevator. Such a requirement would in many cases, especially in the case of a freight elevator that might not be used often, or only at particular hours of a day, amount to an onerous burden and an unreasonable one, not contemplated by the ordinance. Brummell was the first person to reach the body of the deceased after the accident, and could not have been so far away as not to be within easy reach if the deceased had chosen to call upon him to operate the elevator. Considering all the evidence upon that subject, it was, in the language of Chief Justice

Carter, *supra*, "of too inconclusive and unsubstantial a character to be the foundation of a verdict," because of a violation of said section 1653.

We will next consider section 1572, which is as follows:

"Section 1572. Elevator-shaft doors.—Doors in such shafts shall be made of metal, and the catches or fastenings upon such doors shall be so placed that they can be opened only from the inside of the shaft, and entirely under control of the elevator operator."

The evidence showed that all the doors to the elevator shaft were made of iron or iron and tin. They were double and were provided with a latch or hook on the inside that caught and held them together. These hooks or latches were made so that without the use of some appliance from the outside they could only be opened from the inside of the shaft.

It was shown by the testimony of several witnesses that the doors were susceptible of being opened, and were frequently opened, from the outside, by means of inserting a piece of card board, a thin piece of iron, a knife blade, or anything thin and strong, in the space between the doors and lifting the latch or hook that held them together.

The provision of the ordinance that the catches or fastenings shall be so placed that they can be only opened from the inside of the shaft, must be reasonably construed, and should not be held to be prohibitive of fastenings that shall not be proof against ingenuity or exterior force of an unusual and uncontemplated kind. We do not think the conclusion of appellant, that because the doors were capable of being opened in the manner proved there was a violation of the ordinance in such respect, is warranted.

But if there had been a technical violation of the ordinance in respect to the openings, there is no tangible evidence that a failure to comply with the ordinance was the proximate cause of the accident. There can be no pretense that the accident was due in any measure to imperfect fastenings to doors upon any floor above the basement.

The custom of the business seems to have been for Brum-

mell to test the elevator every morning by running it up and down, and then to leave it at the bottom or basement floor with those doors open ready for loading the elevator when required.   That is what was done on the morning in question, and the doors were open to take on the barrels of glassware which the deceased and Neides were preparing to load the elevator with.

Of course it was necessary that the doors should be open in order to put a load into or upon the elevator.   Just before the barrels were in position to be put into the elevator.   Neides was called away from the work for a few minutes—he was away, in fact, four or five minutes—and before leaving he told deceased to wait until he came back. The next thing known of the deceased was that he was lying in the bottom of the shaft, dead, or substantially so. The deceased had assisted in the same kind of work frequently before, and knew he had never been permitted to operate the elevator alone.   The only times on which he had operated it, were when Neides was present in the elevator with him.

Under such circumstances it would have been an unnecessary and uncalled-for precaution for Neides to have closed the doors, especially when he told the deceased to wait for his return before doing anything more—his position being such as cast a duty upon the deceased to obey his orders. Had the deceased kept out of the elevator, as he was in effect commanded to do, the accident could not by any possibility have happened.   The elevator was in complete working order; it had been tested by Brummell only a few minutes before, and worked all right and was in good condition; and it was used fifteen minutes after the accident to carry up the body of deceased.

We are unable to find any evidence fairly tending to show that appellee was guilty of any negligence concerning the elevator or its operation, which it can be said was the proximate cause of the death of appellant's intestate.

" Actionable negligence, or negligence which constitutes a good cause of action, grows out of a want of ordinary care

and skill in respect to a person to, whom the defendant is under an obligation or duty to use ordinary care and skill. * * * It is a rule of law too well settled to require the citation of authorities, that where the breach of duty alleged is not the cause of the injury received, there can be no recovery. * * * The absence of either a fire-proof shaft, or of metal doors in the shaft, or of catches or fastenings on the doors which could only be opened on the inside of the shaft and were entirely under the control of the operator, did not cause or contribute to the personal injury that was received by appellant. Gibson v. Leonard, 143 Ill. 182; see also, Chicago & Galena Union R. R. Co. v. Loomis, 13 Ill. 548; Illinois Central R. R. Co. v. Phelps, 29 Ill. 447; Quincy, A. & St. L. R. R. Co. v. Wellhoener, 72 Ill. 60."

Lest it may be intended by appellant, by his occasional remarks scattered through his argument, to rely upon appellee's alleged negligence in not instructing and warning the deceased concerning the use of the elevator, we will briefly comment upon that phase of the case. Some of the counts of the declaration do allege a neglect by appellee in such respect. It is, we think, a sufficient answer to appellant's contention with reference to that aspect of the case, if it be that he does so contend, to say that although the evidence does not show that the deceased was ever instructed or warned with respect of the use of the elevator, it plainly appears that not only was he never directed or expected to use the elevator by himself, but also that he had never been permitted to use it alone, and that on the particular occasion involved he was in effect commanded not to use it.

The inference from all the evidence is that the deceased in an excess of zeal undertook to load and operate the elevator while Neides was away, and that in some manner it passed beyond his power of control, and that in going up his body was caught between the elevator frame work and the doors at the third floor, and crushed to death. But we fail to find in the record any evidence, beyond the mere circumstance of the death, which serves to attach to appellee such neglect or failure in duty as renders him liable, in the eye of the law, for the deplorable result.

The judgment of the Circuit Court will therefore be affirmed.